# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| CHARLOTTE ANNE BENNER, | ) | CASE NO. 3:21-CV-01714-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP, II |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **REPORT AND RECOMMENDATION** |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant, | | |

## I.    INTRODUCTION

Plaintiff Charlotte Anne Benner ("Ms. Benner") seeks judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (ECF Doc. 1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to a magistrate judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order No. 2022-14 on September 2, 2022. For the reasons set forth below, I RECOMMEND that this Court VACATE the final decision of the Commissioner and REMAND this case for further proceedings consistent with this Report and Recommendation.

## II.     PROCEDURAL HISTORY

Ms. Benner filed an application for DIB on August 6, 2019, and an application for SSI on September 12, 2019, alleging a disability onset date of July 12, 2019. (Tr. 150-58).[1] Her application was denied initially on December 4, 2019, and upon reconsideration on April 15, 2020, and Ms. Benner requested a hearing before an administrative law judge ("ALJ"). (Tr. 87-93, 95-106). On October 14, 2020, an ALJ held a hearing, during which Ms. Benner, represented by counsel, and an impartial vocational expert testified. (Tr. 31-57). On October 26, 2020, the ALJ issued a written decision finding Ms. Benner was not disabled. (Tr. 12-30). The ALJ's decision became final on July 20, 2021, when the Appeals Council declined further review. (Tr. 1-6). Ms. Benner asserts the following assignments of error:[2]

1.  The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul as constitutionally defective.

2.  The ALJ erred when he failed to find that Benner's dizziness and hypotension were severe impairments at Step Two of the Sequential Evaluation.

3.  The ALJ committed harmful error when he failed to find that Benner satisfied the criteria a Listing or combination of Listings at Step Three of the Sequential Evaluation. In the alternative, the ALJ erred when his RFC failed to consider the effect of the combination of Benner's severe impairments on her ability to engage in substantial gainful activity on a sustained and full-time basis.

4.  The ALJ erred in his analysis of the treating source statement and his evaluation of Benner's symptoms was in violation of Social Security Ruling 16-3p.

(ECF Doc. 8, PageID#922-23).

## III.    BACKGROUND INFORMATION

### A.  <u>Personal, Educational, and Vocational Evidence</u>

---

[1] The Transcript of the Proceedings before the Social Security Administration for this case can be located at ECF Doc. 5 on CM/ECF.

[2] Ms. Benner's assignments of error in her merits brief are set forth verbatim herein, including certain typographical and/or grammatical errors.

Ms. Benner was born in March 1977, and she was 42 years old on the alleged disability onset date. (Tr. 24). Ms. Benner completed the 11th grade and lives with her son. (Tr. 35-36). She has a driver's license and has no issues with driving. (Tr. 35). Her past relevant employment included work as a nurse aide, a packer, a sealing machine operator, and a laborer. (*See* Tr. 24, 36-40).

### B.  Relevant Hearing Testimony

#### 1. *Ms. Charlotte Anne Benner's Testimony*

Ms. Benner testified that she was prevented from working full-time due to depression, flashbacks "of things that's been happening in [her] life," bladder issues, dizziness, lightheadedness, and memory issues. (Tr. 41). She testified that her balance would be off at times, and that she would have issues when she is in the car, getting out of the car, and getting up the stairs into her house. (*Id.*). She stated that she can walk approximately half of a city block. (*Id.*). She testified that, depending on the day, she cannot walk more than half a city block due to her poor balance. (*See id.* at 41-42). She stated that she can stand for 10 minutes and sit for 10 minutes. (Tr. 42-43).

Ms. Benner stated that she attended physical therapy, and her physical therapist limited her to lifting five to eight pounds. (Tr. 42). Additionally, she testified that she limited herself to lifting no more than five pounds. (Tr. 43). She testified that she was able to cook but would often forget to turn the stove off. (Tr. 44). She also stated she did her chores, but it would take two times longer than it did before. (*Id.*). She testified that she no can no longer mow the yard, hand wash dishes, or perform deep cleaning ("decluttering"). (Tr. 45). She stated that she used to be interested in reading, but she cannot do so now because she lacks focus. (*Id.*).

When Ms. Benner's counsel asked about her mental health, Ms. Benner related that she would have flashbacks, and during certain flashbacks she "completely los[t] it." (Tr. 46). She stated these flashbacks would make her cry, and she would have to "get away from everybody, everything." (Tr. 46). She stated that she would have an anxiety attack, and that she would not eat for days. (*Id.*). She further testified she had memory issues where she could not remember certain things, such as whether she took her medication. (*Id.* at 46-47). She stated that she was on two different medications for palpitations. (Tr. 47). She further testified that she still has flashbacks. (Tr. 48). She also testified that she was seeing things that were not there. (Tr. 50).

## 2. *Vocational Expert's Testimony*

Paula Zinsmeister, a Vocational Expert ("VE"), testified at the hearing. She testified that Ms. Benner's past employment including working as a nurse aide, hand packager, sealing machine operator, and general laborer. (Tr. 52). The ALJ asked whether a hypothetical individual similar to Ms. Benner with an environmental limitation to avoid all exposure to hazards (such as dangerous moving machinery and unprotected heights), work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, and occasional interaction with the general public, coworkers, and supervisors could perform any of her identified past relevant work jobs. (Tr. 53). The VE opined that the individual could not perform her past relevant work, but she could perform jobs as a laundry worker II, cook helper, housekeeping cleaner, mail clerk, or routing clerk. (Tr. 53-55). If a hypothetical individual were limited to sedentary exertional level, the VE opined that the individual could perform jobs as a circuit board inspector, final assembler, or document preparer. (Tr. 55). If off task for more than 15% of the time, the VE testified that there would be no jobs that the hypothetical individual could perform. (Tr. 55-56). If absent more than once per month, the VE opined that there would be no work. (Tr. 56). When Ms.

Benner's attorney inquired whether the hypothetical individual could perform any jobs if the individual required working in isolation, the VE opined that there would be no work that the individual could perform. (*Id.*).

### C.  Relevant Medical/Non-Medical Opinion Evidence

#### 1. *State Agency Medical Consultants*

##### a.  David Knierim, M.D.

Dr. Knierim opined that Ms. Benner's physical impairments are not severe. (Tr. 63). He stated that she had no significant limitation related to her physical impairments. (*Id.*).

##### b.  Gary Hinzman, M.D.

Dr. Hinzman reviewed Ms. Benner's claim at the reconsideration level. He noted that Ms. Benner had dizziness and fatigue. (Tr. 78-79).

##### c.  Paul Tangeman, Ph.D.

Dr. Tangeman found that Ms. Benner had mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others, concentrating, or maintain pace; and moderate limitations in adapting or managing herself. (Tr. 64). He found that Ms. Benner did not meet any of the listings. (Tr. 63-64). Considering Ms. Benner's RFC, Dr. Tangeman found that Ms. Benner could cope with the stress of simple and routine tasks; understand and carry out simple and routine tasks, as well as some more complex tasks; maintain attention for simple and routine tasks; interact with others at least superficially; and may work best along in a small group setting with minimal contact with others. (Tr. 67).

##### d.  Aracelis Rivera, Psy.D.

Dr. Rivera opined that Ms. Benner had mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in

concentrating, persisting, or maintaining pace; and moderate limitations in adapting or managing herself. (Tr. 76). Dr. Rivera further found that Ms. Benner did not meet any listings. (*Id.*). Considering Ms. Benner's RFC, Dr. Rivera found that Ms. Benner could understand and remember one to three step tasks that do not entail fast-paced demands; interact superficially with others; and could adapt to routine changes. (Tr. 80). Dr. Rivera opined that she may work best alone or in a small group setting, with minimal contact with the general public and others. (*Id.*).

### 2. *Bonnie Crowe, LPC*

Ms. Crowe opined that Ms. Benner was unable to perform any job functions due to her reported symptoms of unsteadiness, shaky hands, and difficulty concentrating. (Tr. 735). She further opined that Ms. Benner is diagnosed with major depressive disorder and posttraumatic stress disorder. (*Id.*). Due to Ms. Benner's diagnoses, Ms. Crowe stated that Ms. Benner would have periods of decreased interest, difficulty concentrating, sleep disturbance, fatigue, re-experiencing, avoidance of reminders of trauma, negative emotional state, diminished participation, detachment, irritability, and hypervigilance. (*Id.*). Ms. Crowe also stated that if Ms. Benner is triggered due to trauma, she may have a flashback or engage in avoidance, "in addition to the other symptoms." (*Id.*). She also opined that Ms. Benner would need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of Ms. Benner's medical conditions. (*Id.*).

Ms. Crowe indicated that Ms. Benner's condition would cause episodic flare-ups that would periodically prevent Ms. Benner from performing her job functions. (Tr. 736). Ms. Crowe opined that it was potentially medically necessary for Ms. Benner to be absent from work during the flare-ups, depending on the trigger and Ms. Benner's reactions to the trigger. (*Id.*). Finally, when asked to estimate the frequency of flare-ups and duration of incapacity that Ms. Benner could

6

have over the next six months, Ms. Crower stated that she was unable to determine the frequency because this was dependent on Ms. Benner's exposure to triggers, and Ms. Crowe could not determine when a trigger will present. (*Id.*).

### D.  Relevant Medical Evidence

In this proceeding, Ms. Benner primarily challenges the ALJ's findings with respect to her impairments of dizziness and hypotension, along with her mental impairments. The ALJ summarized Ms. Benner's health records and symptoms related to these issues as follows:

> The claimant has also been diagnosed with endometriosis, dizziness, and hypotension. These impairments are not "severe" impairments within the meaning of the Social Security Act and Regulations because there is no evidence that these conditions cause more than minimal limitations on the claimant's ability to perform work-related activities (20 CFR 404.1522, 404.1529; 20 CFR 416.922, 416.929; and SSRs 85-28 and 16-3p). In March 2020, the claimant was seen by Brett Might, CNP, and reported dizziness. (Ex. 10F pg. 9). Physical examination found no acute distress, and no neurological deficits. (Ex. 10F pgs. 12, 13). Three months later, the claimant followed up and she denied dizziness. (Ex. 14F pg. 12). Tilt-table test in October 2019, was positive for dysautonomia. (Ex. 5F pg. 7). Nevertheless, the undersigned has accounted for all impairments in the residual functional capacity as necessary taking into account the totality of the record.
>
> The claimant's headaches were evaluated, pursuant to SSR 19-4p, and the undersigned finds that headaches are not a medically determinable impairment. Secondary headaches are not a medically determinable impairment. The record shows that the claimant reported headaches. (Ex. 10F pgs. 12, 18). On November 27, 2019, the claimant was seen by Bonnie Crowe, LPC, and noted that her blood pressure was low and her headaches had increased, and her doctor discussed with her "rebound headaches" related to her use of Tylenol. (Ex. 12F pg. 7). In June 2020, the claimant denied headaches. (Ex. 14F pg. 12). Therefore, the undersigned finds that this is a not a medically determinable impairment. In the alternative, the undersigned finds that no medical source opined limitations based upon this condition and therefore it would be non-severe.
>
> ….
>
> The claimant was seen by Christian Schumacher, M.D., on July 31, 2019, and noted that she struggled with anxiety and her focus. (Ex. 1F pg. 14). Her exam found good memory and judgment, and sustained attention, however her mood was anxious and overwhelmed. (Ex. 1F pg. 15). Two months later, on September 24, 2019, the claimant reported visual hallucinations, crying spells, and some

anxiety. (Ex. 1F pg. 5). His mental status examination demonstrated a logical thought process, good memory, and sustained attention. (Ex. 1F pg. 6). Dr. Schumacher adjusted the claimant's medication and advised her to follow up in two weeks. (Id.). Additionally, the claimant received counseling with Bonnie Crowe, LPC, at New Transitions Counseling in 2019. (Ex. 3F pgs. 19-39; Ex. 12F pgs. 3-11).

On October 21, 2019, the claimant followed up with Dr. Steiner and stated that she maintained medication compliance. (Ex. 7F pg. 23). He adjusted her medication at that time. (Ex. 7F pg. 24). One month later, Dr. Steiner followed up with the claimant and his mental status examination demonstrated a logical thought process, good memory, and a sustained attention. (Ex. 7F pgs. 20, 21). The claimant continued to follow up with Dr. Schumacher on a regular basis. (Ex. 7F pgs. 11-19).

Treatment records from New Transitions Counseling showed regular counseling visits in 2020. (Ex. 12F pgs. 12-43). Dr. Schumacher saw the claimant in March 2020, and reported high anxiety. (Ex. 7F pg. 8). His examination revealed fair judgment, good memory, and sustained attention. (Ex. 7F pg. 9). Additionally, the claimant had a logical thought process, although her affect was constricted and her mood was overwhelmed. (Id.). Dr. Schumacher increased the claimant's Klonopin and recommended that she follow up in one month. (Id.). The claimant followed up one month later, and her medications were continued. (Ex. 13F pg. 9). In August 2020, the claimant followed up with Dr. Schumacher and he continued her medication regimen. (Ex. 13F pg. 13).

…

(Tr. 18, 21-22).

## IV. THE ALJ'S DECISION

In his October 26, 2020, decision, the ALJ made the following findings:[3]

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since July 12, 2019, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: major depressive disorder; posttraumatic stress disorder (PTSD); and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

---

[3] The ALJ's findings are summarized.

8

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. Occasional interaction with the general public, coworkers, and supervisors.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [in March 1977] and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 12, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-26).

## V.     LAW AND ANALYSIS

### A.  <u>**Standard of Review**</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or

10

deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C.  Analysis

Ms. Benner raises four issues for judicial review. First, Ms. Benner argues that the appointment of former Commissioner Andrew Saul as the Commissioner of the SSA violated the

11

separation of powers and, as a result, the ALJ's decision in this case is constitutionally defective because the ALJ derived his authority from Commissioner Saul. (ECF Doc. 8, PageID#929-32). Second, Ms. Benner argues that the ALJ erred because the ALJ failed to find that her dizziness and hypotension were severe impairments at Step Two of the sequential evaluation. (ECF Doc. 8, PageID#932-34). Third, Ms. Benner argues that the ALJ erred at Step Three by failing to find that she satisfied the criteria of listings, and in the alternative, the ALJ erred when the ALJ's RFC failed to consider the effect of the combination of Ms. Benner's severe impairments on her ability to engage in substantial gainful activity on a full-time and sustained basis. (*Id.* at 934-41). Finally, Ms. Benner contends that the ALJ erred in his analysis of Ms. Benner's treating source statement and evaluation of her symptoms under SSR 16-3p. (*Id.* at 941-45).

### 1. *Ms. Benner's First Assignment of Error*

As noted, Ms. Benner first argues that the ALJ's decision is constitutionally defective because the ALJ derived his authority from former Commissioner Andrew Saul, whose appointment as Commissioner of the SSA violated the separation of powers. (ECF Doc. 8, PageID#929-32). For the reasons that follow, Ms. Benner's challenge to the constitutionality of the ALJ's decision lacks merit.

Initially, I note that Ms. Benner's complaint does not include any constitutional claims. (ECF Doc. 1). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" A complaint need not provide "detailed factual allegations," but it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell v. Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the

defendant fair notice of what the … claim is and the grounds upon which it rests[.]" *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In her merits brief, Ms. Benner grounds her constitutional claim in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), decided in June 2020, but failed to make this claim when she filed her complaint in September 2021. Accordingly, her constitutional claim – advanced for the first time in her merits brief (ECF Doc. 8, PageID#929-32) – is procedurally improper. *See, e.g., Hawes v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-02848-DAR, 2022 WL 2346998, at *7 (N.D. Ohio Apr. 15, 2022), *report and recommendation adopted sub nom. Hawes v. Kijakazi*, No. 5:20-CV-02848, 2022 WL 2342642 (N.D. Ohio June 28, 2022).

Even if considered on its merits, however, Ms. Benner's constitutional claim fails. Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, pursuant to 42 U.S.C. § 902(a). *See* Social Security Administration, Executive Bios, Andrew Saul, https://www.ssa.gov/ndf/documents/SSA%20Executive%20Bios-11182020.pdf (last visited Feb. 17, 2023). Section 902(a)(3) provides that "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id.* The parties agree that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner as the head of an executive agency. (ECF Doc. 15, PageID#696-97;ECF Doc. 17, PageID#726); *see also Seila Law LLC*, 140 S. Ct. at 2197 (statutory restriction on the President's ability to remove the head of an agency "for inefficiency, neglect, or malfeasance" violates the separation of powers and is unconstitutional); *Collins v. Yellen*, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

In *Seila Law*, the Supreme Court held that a statutory provision allowing the President to remove the Director of the Consumer Financial Protection Board ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President. 140 S. Ct. at 2197. The Court also found that the unconstitutional removal provision was severable from the other provisions of the relevant statute, thereby maintaining the CFPB intact as an agency. *Id*. at 2208, 2211. The Supreme Court did not discuss what a plaintiff must show to obtain relief when challenging actions taken by the head of an agency who derived powers from a statute that included an unconstitutional removal provision. The Court, however, addressed this issue in *Collins v. Yellen*.

In *Collins*, the Supreme Court considered a similar statute similar to the one at issue in *Collins* governing the removal of Directors of the Federal Housing Finance Agency ("FHFA"). The Court held that, "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by FHFA . . . as void." 141 S. Ct. at 1787 (emphasis in original).

In *Collins,* the Court further found "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. *Id.* at 1788; *id*. at 1778 n.23 (citing *Seila Law*, 140 S. Ct. at 2207-11) ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment"). Rather, to obtain reversal of an agency decision, a plaintiff would need to demonstrate "compensable harm" flowing from the unconstitutional removal clause. *Id*. at 1788-89. The Supreme Court offered

examples of situations where unconstitutional removal restrictions could inflict compensable harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the status did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id*. at 1789.

Here, Ms. Benner claims she did not receive a valid administrative process because the ALJ's authority to make disability determinations was derived from a Commissioner who was subject to an unconstitutional removal provision. (*See* ECF Doc. 8, PageID#929-30). Additionally, Ms. Benner claims that "Mr. Saul implemented changes to HALLEX and new regulations which impacted [her] and her application for benefits," and she was harmed "by the improper appointment of the Commissioner and the modifications which were implemented during [Mr.] Saul's tenure as Commissioner." (*Id.* at 931).

As in *Collins*, the existence of an unconstitutional removal provision did not strip Commissioner Saul of his authority to carry out the functions of his office, including the authority to delegate disability determinations to ALJs and to implement changes to Agency regulations. Without Ms. Benner showing that § 902(a)(3)'s removal restriction inflicted specific, compensable harm on her, remand for a *de novo* hearing is not available to her.

Other federal courts in this judicial district, this state, and across the country, have also concluded that the appointment of Andrew Saul does not require remand. *See, e.g., Katrina R. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4276, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022) (collecting cases); *Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021). I similarly decline to recommend remand on this basis. Thus, even if

Ms. Benner's constitutional claim was procedurally proper—which it is not—she has not articulated a specific, compensable harm that she sustained as a result of the unconstitutional removal provision in § 902(a)(3). As a result, Ms. Benner's first assignment of error lacks merit.

### 2. *Ms. Benner's Second Assignment of Error*

Ms. Benner next argues that the ALJ erred by failing to find that her medically determinable impairments of dizziness and hypotension are severe impairments at Step Two, and that the ALJ failed to consider all of her impairments when assessing the RFC, necessitating a remand. (ECF Doc. 8, PageID#932-34). For the following reasons, I agree.

### a. *Step Two & RFC*

At Step Two of the sequential evaluation process, an ALJ must determine whether aclaimant's medically determinable impairment is a "severe" impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step two has been described as a '*de minimus* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988)). When an ALJ finds severe and non-severe impairments at Step Two and continues with the subsequent Steps in the sequential evaluation process, any error at Step Two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Prior to determining whether a claimant can perform her past relevant work at Step Four, an ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess

your residual functional capacity."); 20 C.F.R. § 404.1520(e) ("[W]e will assess and make a finding about your [RFC] based on all the relevant medical and other evidence in your case record[.]"). RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). Agency regulations direct the ALJ's assessment of a claimant's RFC is to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. SSR 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

### b. *The ALJ's Analysis*

In his decision, the ALJ at Step Two found that endometriosis, dizziness, and hypotension were not severe impairments. (Tr. 18). The ALJ stated the following:

> The claimant has also been diagnosed with endometriosis, dizziness, and hypotension. These impairments are not "severe" impairments within the meaning of the Social Security Act and Regulations because there is no evidence that these conditions cause more than minimal limitations on the claimant's ability to perform work-related activities (20 CFR 404.1522, 404.1529; 20 CFR 416.922, 416.929; and SSRs 85-28 and 16-3p). In March 2020, the claimant was seen by Brett Might, CNP, and reported dizziness. (Ex. 10F pg. 9). Physical examination found no acute distress, and no neurological deficits. (Ex. 10F pgs. 12, 13). Three months later, the claimant followed up and she denied dizziness. (Ex. 14F pg. 12). Tilt-table test in October 2019, was positive for dysautonomia. (Ex. 5F pg. 7). Nevertheless, the undersigned has accounted for all impairments in the residual functional capacity as necessary taking into account the totality of the record.

(*Id.*).

The ALJ also concluded that Ms. Benner's headaches were not a medically determinable impairment. (*Id.*). He stated the following:

> The claimant's headaches were evaluated, pursuant to SSR 19-4p, and the undersigned finds that headaches are not a medically determinable impairment. Secondary headaches are not a medically determinable impairment. The record shows that the claimant reported headaches. (Ex. 10F pgs. 12, 18). On November 27, 2019, the claimant was seen by Bonnie Crowe, LPC, and noted that her blood pressure was low and her headaches had increased, and her doctor discussed with

17

her "rebound headaches" related to her use of Tylenol. (Ex. 12F pg. 7). In June 2020, the claimant denied headaches. (Ex. 14F pg. 12). Therefore, the undersigned finds that this is a not a medically determinable impairment. In the alternative, the undersigned finds that no medical source opined limitations based upon this condition and therefore it would be nonsevere.

(*Id.*).

### c. *Ms. Benner's Arguments*

Ms. Benner argues that the ALJ erred by failing to find that her medically determinable impairment of dizziness and hypotension are severe impairments at Step Two. (ECF Doc. 8, PageID#932). In addition, she contends the ALJ erred by failed to address her dysautonomia and paroxysmal supraventricular tachycardia.. (*Id.*). Ms. Benner argues that the ALJ failed to find any impairments related to her physical problems and symptoms in the RFC, and that the ALJ's failure to consider these impairments when assessing the RFC necessitates a remand. (*See id.* at 934).

In support of her argument that the above-mentioned impairments are severe, Ms. Benner points to her own testimony, wherein she indicated that she would get dizzy and lightheaded and her balance would be off. (*Id.* at 933 (citing Tr. 71)). She also points to the following medical records:

- At her September 24, 2019 appointment at MercyHealth, Ms. Benner related that she felt dizzy and tired. (Tr. 351). It was noted that she had recurrent dizziness and chronic fatigue along with headaches. (*Id.*).

- Ms. Benner was referred for a tilt table test. (Tr. 355).

- On October 2, 2019, Ms. Benner had a tilt table test for postural dizziness. (Tr. 459-60). It was an abnormal head upright tilt table study (Tr. 459). The study conclusion indicated that Ms. Benner's heart rate, blood pressure response, and symptoms were most consistent with dysautonomia. (*Id.*).

- At her October 18, 2019 visit with Dr. Steven Bruhl, Dr. Bruhl noted that Ms. Benner reported daily symptoms of intermittent lightheadedness and dizziness. (Tr. 509). She stated to Dr. Bruhl that when she stands she does have to hold on to the wall and wait a few seconds before moving. (*Id.*).

18

- Ms. Benner had a 2019 Holter test with indications of paroxysmal supraventricular tachycardia ("PSVT"). (Tr. 672).

- On March 13, 2020, Ms. Benner met with Dr. Bruhl with complaints of fatigue, tiredness, and foggy brain. (Tr. 657).

- During her March 17, 2020 appointment, Ms. Benner's encounter notes indicated that she was positive for fatigue, gait, problems, dizziness, light-headedness, headaches, decreased concentration, dysphoric mood, sleep disturbance. (Tr. 596). She was also noted to be nervous/anxious. (*Id.*).

(ECF Doc. 8, PageID#933). After citing these records, Ms. Benner concludes that the above-mentioned impairments satisfy the *de minimus* standard under Step Two because the records show that her "dizziness and light headedness related to her dysautonomia and PSVT caused more than minimal limitations on her ability to engage in substantial gainful activity on a sustained and full-time basis." (*Id.* at 934).

### d. *Analysis*

Ms. Benner's argument that the ALJ erred at Step Two is well-taken.[4] First, it should be noted that Ms. Benner's assertion that the ALJ did not consider her diagnosis of dysautonomia is not fully accurate. As demonstrated above, the ALJ did discuss her positive tilt-table results of dysautonomia when determining whether her severe dizziness constituted a severe impairment. (Tr. 18). He also did cite records to support his conclusion that Ms. Benner's dizziness and hypotension impairments were not severe. (*See id.*). Yet, while the ALJ appears to acknowledge that Ms. Benner had positive results for dysautonomia, the ALJ omits any discussion on how dysautonomia may influence her dizziness symptoms. (*See id.*). While the ALJ does point to an October 2019 record indicating that Ms. Benner had a tilt table test for postural dizziness, he omits the fact that the study's conclusion indicated that Ms. Benner's heart rate, blood pressure response,

---

[4] To the extent that Ms. Benner argues that the ALJ erred at Step Two by not finding endometriosis or hypotension limited her, these arguments are waived. Ms. Benner did not point to any evidence that either of these conditions resulted in limitations.

and symptoms were most consistent with dysautonomia. (*Id.*). Moreover, in discussing Ms. Benner's dizziness and hypotension, the ALJ omitted any mention of her diagnosis of paroxysmal supraventricular tachycardia. (*See id.*). And the medical records indicate that her dizziness may have been "potentially related" to either her anxiety medications and/or her known PSVT that was observed on her 2019 Holter test. (Tr. 660). Furthermore, as Ms. Benner points out, there were visits where she reported dizziness and lightheadedness. (Tr. 509, 596). Given these records and Ms. Benner's testimony, the ALJ erred in determining that she failed to meet the *de minimis* burden of proving that her dizziness was not severe. The medical record indicate that these impairments were having more than a minimal impact on his ability to work.

Even though the ALJ erred in finding that these impairments were non-severe, the Court must analyze whether the error was harmless. Once an ALJ determines that one or more of the claimant's impairments are severe, the ALJ must consider all the claimant's severe and non-severe impairments in the remaining steps of the sequential analysis. The Commissioner argues the finding that Ms. Benner's dizziness was a non-severe impairment at Step Two would be legally irrelevant if the ALJ considered them in the remaining steps of the sequential analysis. *See Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008), citing *Mariarz v. Secy'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (holding that the failure to find that an impairment was severe was harmless error where other impairments were deemed severe). In cases such as this, courts look to see whether the ALJ actually considered impairments deemed non-severe at later steps in the sequential analysis. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 191 (6th Cir. 2009); *White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 787 (6th Cir. 2009).

Here, the ALJ determined that Ms. Benner suffered from severe impairments of major depressive disorder, post-traumatic stress disorder, and generalized anxiety disorder. Because the

20

ALJ determined that Ms. Benner suffered from these severe impairments, the ALJ was required to consider all of Ms. Benner's impairments in the remaining steps of his analysis, including in making his RFC finding. *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. At 191. Here, however, the ALJ's only discussion of Ms. Benner's dizziness is found at Step Two of his analysis. (Tr. 18). At the end of the Step Two analysis on Ms. Benner's endometriosis, dizziness, and hypotension, the ALJ's decision sets forth  the following catch-all statement: "[n]evertheless, the undersigned has accounted for all impairments in the residual functional capacity as necessary taking into account the totality of the record." (*Id.*). Yet notwithstanding this catch-all statement, there is no indication that the ALJ did in fact further consider Ms. Benner's dizziness in formulating his RFC. Indeed, there is no discussion of the impairment at any other step in his decision, except for one sentence where the ALJ discounts Dr. Knierim's (a State Agency specialist), opinion that Ms. Benner's impairments were not severe. (Tr. 23). Specifically, in determining that Dr. Knierim's opinion was not persuasive overall, the ALJ stated, "[w]hile the claimant's medical impairments are not severe, … there are some non-exertional limitations, including no exposure to hazards." (*Id.*).

The Commissioner appears to argue that the ALJ properly considered these impairments in the remaining steps of his analysis by pointing to the ALJ's catch-all statement referenced above. Further, the Commissioner asserts that, in addition to considering the record as a whole, the ALJ explicitly analyzed the evidence of Ms. Benner's dizziness.  (*Id.* at 980.) And the Commissioner asserts that substantial evidence supports the ALJ's consideration of Ms. Benner's dizziness. (*Id.*). Even assuming this was the case, this does not resolve the issue because Ms. Benner's burden at Step Two was a *de minimis* hurdle, and there was evidence in the record showing that Ms. Benner's dizziness was severe. (Tr. 509, 596, 660). Further, even if the ALJ had properly found her dizziness

to be a non-severe impairment, the ALJ was still required to consider Ms. Benner's severe impairments at the remaining steps of the analysis. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x at 191; *Huminski v. Comm'r of Soc. Sec.*, No. 5:16-cv-3000, 2017 WL 6603277, at *7-8 (N.D. Ohio Dec. 6 ,2017). The ALJ failed to do so (*see generally* Tr. 19-23), and the Commissioner's brief does not adequately address this point. Thus, I cannot find that substantial evidence supports the ALJ's RFC finding at Step Four based on the catch-all statement ("[a]fter careful consideration of the entire record") in the ALJ's Step Two analysis.

Because the ALJ's decision does not indicate that Ms. Benner's impairments were considered in formulating Ms. Benner's RFC, the ALJ failed to follow the proper legal standards. Accordingly, I recommend that the Court remand to allow the ALJ the opportunity to address the impact of Ms. Benner's PSVT and dysautonomia on her physical RFC.

### 3. *Ms. Benner's Third Assignment of Error*

Ms. Benner asserts in her third assignment of error that the ALJ committed harmful error when he failed to find that she satisfied the criteria of a Listing or combination of Listings at Step Three. (ECF Doc. 8, PageID#934-39). In the alternative, the ALJ erred when his RFC failed to consider the effect of the combination of her severe impairments on her ability to engage in substantial gainful activity on a sustained and full-time basis. (*Id.* at 939-41). She raises multiple sub-claims: (1) the ALJ erred in determining that she does not meet or medically equal Listings 12.04, 12.05, and 12.16; (2) the ALJ failed to address all her functional limitations, especially those related to her dysautonomia and related dizziness and lightheadedness; (3) the ALJ failed to develop a full and fair record as to all components of the applicable Listings, including an evaluation of the evidence and an explained conclusion; (4) the ALJ failed to acknowledge medical conditions with which she was diagnosed and ignored any evidence related to her functional

limitations stemming from her dysautonomia and hypotension; (5) the ALJ did not comply with SSR 96-8p; and (6) the ALJ did not build an accurate and logical bridge between the evidence and the result. (*Id.* at 934-41). For the following reasons, I disagree that the ALJ erred in determining that Ms. Benner failed to satisfy the criteria of Listings 12.04, 12.05, and 12.16, but agree that the ALJ erred in his Step Three analysis by failing to consider her impairments of dizziness, dysautonomia, PSVT, and hypotension.

### a. *Listings 12.04, 12.05, ad 12.16*

### i. **Step Three**

At Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant

could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42)). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

### ii. Paragraph B Criteria – Listings 12.04, 12.05, and 12.16

To satisfy the Paragraph B criteria of Listings 12.04, 12.06, and 12.15, a claimant must demonstrate at least two marked limitations or at least one extreme limitation in the four areas of mental function. The four areas of mental functioning are: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. Pt. 404, App'x 1, Listings 12.04(B), 12.05(B), 12.16(B). "A marked limitation may arise where several activities or functions are impaired or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652-53 (6th Cir. 2009). A moderate limitation is defined as

24

having a fair ability to function independently, appropriately, effectively, and on a sustained basis in an area. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00F.2.c.

### iii.     Ms. Benner's Arguments

Ms. Benner argues that the ALJ harmfully erred by failing to find that she satisfied the criteria for Listings 12.04, 12.06, and 12.15. (ECF Doc. 8, PageID#934). She contends it is "unclear" how the ALJ determined she could perform jobs in significant numbers which existed in the national economy on a full-time and sustained basis. She asserts that the ALJ relied on the opinion of the State Agency psychologist who last reviewed evidence for this matter in April 2020 and failed to consider the treatment records from her treating sources. She points to the following evidence:

- Ms. Benner reported that she had been having recurrent and worsening issues of flashbacks of being beaten by her husband (Tr. 268), was struggling with her anxiety (Tr. 265), continued to struggle with sleep and found herself to be quite easily overwhelmed (Tr. 262), was seeing things that were not there (Tr. 256-57), was still not sleeping with an increase in her panic attacks, along with still seeing things (Tr. 572), continuing to struggle (Tr. 569), was quite anxious and overwhelmed (Tr. 790), was feeling out of it and disconnected (Tr. 795).

- During her counseling at New Transitions, the counseling notes indicated Benner had a disheveled appearance and depressed mood (Tr. 378), was tearful and depressed (Tr. 387), was tearful and tired with disorganized thought process (Tr. 390, 393, 396), and was disorganization with impaired sleep and limited insight and judgment along with appearing depressed (Tr. 740, 743, 746, 749, 752, 755, 758, 761, 764, 767, 770, 773).

Based on this evidence, she contends that the ALJ's "brief discussion" of any symptoms supporting his contention that she had only mild or moderate limitations failed to account for the medical records documenting her symptoms and related limitations. She argues that the ALJ failed to support his dependence on the State Agency findings, which included an opinion that she may work best alone, or in a small group setting with minimal contact with the general public and others. (*Id.*) (citing Tr. 67, 80). She asserts that the vocational expert witness opined that there

would be no unskilled work that a hypothetical person could perform with this limitation. Thus, she contends that a remand is necessary to correct this error.

Next, Ms. Benner asserts that the ALJ reached an incorrect interpretation of the evidence and contends that the evidence described serious limitations in her ability to function under the Listing's Paragraph B criteria. In addition to her previously cited treatment records, she cites the following hearing testimony:

- Ms. Benner testified she was unable to work full-time due to her depression and flashbacks of things that have been happening in her life, and she had memory issues. (Tr. 41).

- She stated that she was able to cook but would often to forget to turn the stove off. (Tr. 44).

- She testified that she did her chores, but it took two times longer than before. (*Id.*).

- She stated that she could no longer mow the yard, hand wash dishes, and do deep cleaning. (Tr. 45).

- She stated that she could no longer focus when reading. (Tr. 45).

- When she had flashbacks, she testified that she would sometimes "completely lose it." (Tr. 46). She would "start bawling and have to get away from everyone and anything." (*Id.*). She would have an anxiety attack and then she would not eat for days. (*Id.*).

- She stated she had memory issues where she could not remember certain things. (*Id.*).

- She reported seeing things that were not there. (Tr. 50).

Based on this evidence, Ms. Benner contends she had serious limitations with her activities of daily living, and that the limitations described the ALJ were not based on any evidence and were unsupported.

### iv.    The ALJ's Decision

In analyzing whether Ms. Benner met the criteria for Listings 12.04, 12.05, and 12.16, the ALJ stated the following:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06,

and 12.15. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. The "paragraph B" criteria represent the areas of mental functioning a person uses in a work setting, and how mental impairments affect the ability to function independently, appropriately, effectively, and on a sustained basis in each area (20 CFR 404.1520a(c)(2) and 416.920a(c)(2)). To satisfy the "paragraph B" criteria, the mental disorder must result in ''extreme'' limitation of one, or ''marked'' limitation of two, of the four areas of mental functioning: the ability to understand, remember, or apply information; interacting with others; concentration, persistence or maintenance of pace; and the ability to adapt or manage oneself.

The first functional area is the ability to understand, remember, or apply information. In this area, the claimant has a mild limitation. Understanding, remembering, or applying information refers to the abilities to learn, recall, and use information to perform work activities, such as understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions. Aracelis Rivera, PsyD., reviewed the file at the reconsideration level and opined that the claimant had a mild limitation in that area. (Ex. 4A pg. 5). The claimant completed a function report and noted issues with written and spoken instructions. (Ex. 3E pg. 7). Treatment records from Christian Steiner, M.D., generally noted that the claimant had a good memory. (Ex. 7F pg. 9; Ex. 13F pg. 6). Therefore, the evidence supports a finding that the claimant has a mild limitation in the ability to understand, remember, or apply information due to her mental impairments.

The next functional area is interacting with others. In this area, the claimant has a moderate limitation. This area refers to an individual's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. It includes the ability to get along with others, such as supervisors, co-workers, the public, family members, friends, neighbors, grocery clerks, landlords, or bus drivers. At the reconsideration level, Dr. Rivera opined that the claimant was moderately impaired. (Ex. 4A pg. 5). The claimant completed a function report and stated that she did not have problems getting along with family, friends, or authority figures. (Ex. 3E pg. 7). In March 2020, the claimant followed up with Dr. Steiner and his exam revealed an overwhelmed mood and a constricted affect. (Ex. 7F pg. 9). As such, the evidence supports a finding that the claimant has a moderate limitation in interacting with others due to her mental impairments.

The third functional area is concentration, persistence, or maintenance of pace. In this area, the claimant has a moderate limitation. Concentration, persistence, or pace refers to the abilities to focus attention on work activities and stay on task at a sustained rate sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence,

or pace are best observed in work settings, but may also be reflected by limitations in other settings. Following her review at the reconsideration level, Dr. Rivera opined that the claimant was moderately limited in this area. (Ex. 4A pg. 5). In her function report, the claimant noted problems paying attention. (Ex. 3E pg. 7). On March 30, 2020, the claimant was seen by Christian Steiner, M.D., and his mental status examination found sustained attention span. (Ex. 7F pg. 9). Therefore, the evidence supports a finding that the claimant has a moderate limitation in concentration, persistence, or pace due to her mental impairments.

The fourth functional area is the ability to adapt or manage oneself. In this area, the claimant has a moderate restriction. The ability to adapt or manage oneself refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. This includes adaptive activities such as responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions. Dr. Rivera opined that the claimant had a moderate limitation in this area. (Ex. 4A pg. 5). In her function report, the claimant stated that she was not able to handle stress or changes in routine. (Ex. 3E pg. 8). The claimant received counseling at New Transitions Counseling and her insight was often described as limited. (Ex. 12F pgs. 12, 15, 18, 33, 36). Accordingly, the undersigned finds that she has a moderate limitation in the ability to adapt or manage oneself.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied. The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. There is nothing in the record that supports the conclusion that the claimant has had only a "marginal adjustment" as a result of her treatment. The undersigned notes that the treatment records do not contain evidence of inpatient psychiatric hospitalizations related to her mental health impairments. The undersigned has concluded the medical evidence did not demonstrate the claimant's impairments rose to the level of listing level severity, and that no acceptable medical source had mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination. The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 18-20).

### v.    Analysis

Ms. Benner has not demonstrated how she meets or medically equals the Listings' criteria. First, Ms. Benner states a variety of reported symptoms and observations, but she fails to tie any of these cited symptoms to a specific area of mental functioning or explain how this evidence would lead to a finding of a "marked" or "extreme" limitation.[5] (*See* ECF Doc. 8, PageID#936-67). Setting aside this issue, the ALJ appropriately analyzed whether Ms. Benner qualified under the Listings' criteria. Regarding the interacting with others domain, the ALJ concluded that Ms. Benner had only a mild limitation. (Tr. 19). In support of his finding, he pointed to examination evidence showing that Ms. Benner had an overwhelmed and a constricted affect. (Tr. 19 (citing 197). He also noted that Ms. Benner self-reported in her function report that she had no problems getting along with family, friends, or authority figures. (Tr. 19 (citing Tr. 567)).

Regarding the ability to understand, remember, or apply information domain, the ALJ concluded that Ms. Benner had a mild limitation, pointing to examination evidence from Dr. Steiner indicating Ms. Benner had good memory. (Tr. 18 (citing Tr. 567, 791)). Regarding Ms. Benner's functioning in concentrating, persisting, or maintaining pace, the ALJ assessed that she had a moderate limitation. He noted that Ms. Benner reported that she had attention/focus problems. (Tr. 19 (citing Tr. 197)). Then, he also pointed to examination findings from Dr. Steiner, indicating that Ms. Benner demonstrated sustained attention span. (Tr. 19-20 (citing Tr. 567)). Finally, the ALJ found that Ms. Benner had a moderate limitation in adapting or managing oneself, pointing to counseling notes that often describe her insight as limited, and Ms. Benner's reports

---

[5] Further, it appears that Ms. Benner's argument that her cited psychological evidence demonstrates that she had "serious limitations with her activities of daily living" appears to be based on law that is no longer applicable regarding Paragraph B criteria. (ECF Doc. 8, PageID#937). In 2017, Paragraph B included "activities of daily living" as an area of mental functioning. *See* POMS DI 34142.009, Listing 12.00C. However, Paragraph B now provides different areas of mental functioning, specifically (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 12.04(B).

that she was not able to handle stress or changes in routine. (Tr. 20 (citing Tr. 198, 749, 752, 755, 770, 773).

The ALJ supported his determination with the findings of the State Agency consultant, Dr. Rivera. (Tr. 19-20). Dr. Rivera opined that Ms. Benner had a mild limitation in the ability to understand, remember, or apply information; a moderate limitation in interacting with others; a moderate limitation in concentration, persistence, or maintenance of pace; and a moderate limitation in the ability to adapt or manage oneself. (*Id.*). Moreover, the report of the state agency psychological reviewers determined that Ms. Benner does not meet the Listing criteria for Listings 12.04, 12.06, and 12.15. Courts within the Sixth Circuit have widely recognized that the opinion of state agency reviewers is substantial evidence for a decision by the ALJ that rests on that opinion. *See, e.g., Adkins v. Comm'r of Soc. Sec.*, 2019 WL 1040943, at *12 (N.D. Ohio March 5, 2019) (collecting cases).

Although Ms. Benner contends that the ALJ has overlooked evidence in support of a different finding regarding her limitations, a holistic review of the ALJ's decision suggests a different conclusion. *Immke v. Saul*, 2020 WL 1940849, at *6 (N.D. Ohio April 22, 2020) (citation omitted). Ms. Benner specifically contends that the ALJ ignored evidence that she reported flashbacks, struggling with anxiety and sleep, and hallucinating, as well as other reports that she had a disheveled appearance, depressed mood, was tearful, had a flat affect, had impaired judgment and insight, and had disorganized thought process. The ALJ acknowledged this evidence elsewhere in the decision. For example, the ALJ discussed Ms. Benner's reports of anxiety. (Tr. 21-22). The ALJ also noted records indicating that Ms. Benner had a disheveled appearance, depressed mood, disorganized thought processes, and limited judgment and insight. (Tr. 20-21). Moreover, an ALJ is not required "to discuss every piece of evidence in the record to substantiate

30

his decision." *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).

Ms. Benner asserts another subclaim, arguing that "even if the ALJ was accurate in reporting that [she] was capable of performing some daily activities, there was insufficient evidence to prove that she could engage in substantial gainful activity on a sustained basis." (ECF Doc. 8, PageID#938) (citing *Lorman* v. *Comm'r of Soc. Sec.*, 107 F.Supp.3d 829, 838 (S.D. Ohio 2015). She asserts that, as in *Lorman*, the ALJ found that her ability to perform some activities meant she was not disabled. (*Id.*). Thus, she contends that the matter should be remanded for consideration of the totality of the evidence regarding her limitations, as well as the fact that the combination of her impairments and related symptoms precluded her from being able to engage in any substantial gainful activity on a sustained and full-time basis. (*Id.*).

Ms. Benner contends that the ALJ "found that her ability to perform some activities meant she was not disabled." (ECF Doc. 8, PageID#938) (citing *Lorman*). But in *Lorman*, the court found that the plaintiff's ability to perform household duties did not constitute substantial evidence to support the ALJ's finding that the plaintiff could perform substantial gainful activity. *Id.* Significantly, the court in *Lorman* did not address the ability to perform activities in the context of whether a claimant satisfies a listing at Step Three. Furthermore, a review of the ALJ's decision regarding whether Ms. Benner qualified under the Listings Paragraph B criteria indicates that the ALJ did not solely rely on her reported daily activities in determining she was not disabled. Rather, in discussing Ms. Benner's functional areas, the ALJ relied upon the State Agency findings, Ms. Benner's treatment records from Dr. Steiner, and her counseling notes from New Transitions Counseling along with Ms. Benner's reported activities. (See Tr. 19-20). Therefore, I recommend that the Court reject this sub-claim because it lacks merit.

### b.  SSR 96-8p

Next, Ms. Benner states that Social Security Ruling 96-8p "mandates that the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion and describe the maximum amount of each work-related activity the person can perform based on the evidence." (ECF Doc. 8, PageID#940). She contends that ALJ "is responsible for indicating what evidence is relied upon and cannot ignore evidence that does not support the decision, especially if the analysis would change if that evidence was accepted." (*Id.* at 940-41). She concedes that the ALJ discussed "much of the evidence in this matter but disregarded any evidence, as set forth above, which supported [her] evidence and testimony regarding her limitations" and "failed to provide sufficient information so this Court can facilitate meaningful judicial review." (*Id.* at 941).

This assertion is well-taken. Absent from the ALJ's opinion—and the Commissioner's brief—are any citations to the ALJ's consideration of the limitations (or lack of consideration) potentially caused by Ms. Benner's PSVT and dysautonomia. Thus, the Court is unable to determine that the ALJ fulfilled his obligations under the regulations.[6] Because the ALJ legally erred in his Step Two analysis and the error was not remedied by a more thorough discussion in the remainder of the ALJ's decision, the error was not harmless. *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. 2009). Moreover, as a result of the ALJ's minimal discussion regarding Ms. Benner's dysautonomia and hypotension, the ALJ failed to provide a sufficient basis for "meaningful judicial review," meaning that his decision provides no bases for a claimant to

---

[6] To the extent that Ms. Benner raises multiple related sub-claims regarding the ALJ's omission of her dysautonomia and PSVT (*i.e.* failure to conduct a full and fair inquiry, failure to acknowledge medical conditions that Ms. Benner was diagnosed, and failure to address all functional limitations) (ECF Doc. 8, PageID#939-40), those arguments are well-taken because as stated above in Step Two and in this paragraph, the ALJ failed to adequately discuss these conditions in his decision. Thus, I also recommend remand for these additional reasons.

find a logical bridge between the evidence and the ALJ's finding that the impairments had only a minimal effect on Ms. Benner's physical functioning. Accordingly, I recommend that remand is required.

### 4. *Ms. Benner's Fourth Assignment of Error*

Ms. Benner's fourth assignment of error raises two sub-claims: (1) the ALJ erred in his analysis of the treating source statement and (2) the ALJ failed to properly evaluate her subjective symptoms pursuant to SSR 16-3p. For the following reasons, the ALJ properly evaluated the statement of Ms. Benner's treating source, but failed to properly evaluate her subjective symptoms pursuant to SSR 16-3p.

### a. *Evaluation of Medical Opinion*

#### i. **Legal Standard**

Because Ms. Benner's claim was filed after March 27, 2017, the SSA's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."3 20 C.F.R. § 404.1520c(a). Instead, the new regulations direct the ALJ to evaluate the persuasiveness of each medical opinion by considering the five following factors: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and (5) any other factor "that tend[s] to support or contradict a medical opinion or prior administrative medical finding." § 404.1520c(c). Because the regulations consider supportability and consistency the "most important factors," ALJs are obligated to "explain how [they] considered the supportability

33

and consistency factors for a medical source's medical opinions," while they "may, but are not required to, explain how [they] considered" the remaining factors. § 404.1520c(b)(2).

Although these regulations are less demanding than the former rules governing the evaluation of medical source opinions, "they still require that the ALJ provide a coherent explanation of [her] reasoning." *Lester v. Saul*, 2020 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), report and recommendation adopted, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). The new regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, 2021 WL 860506 at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, 2021 WL 3056108 at *11 (W.D. Tenn. July 20, 2021); *see also Childers v. Kijakazi*, 2022 WL 2706150 at * 5 (E.D. Ky. July 12, 2022) ("When the Court is unable to follow the ALJ's logic, error has occurred."). Yet, an ALJ need not specifically use the terms "supportability" or "consistency" in her analysis. *See Hardy v. Comm'r of Soc. Sec.*, 2021 WL 4059310 at *2 (S.D. Ohio Sept. 7, 2021); *Terry Q. v. Comm'r of Soc. Sec.*, 2022 WL 969560 at * 5 (S.D. Ohio March 31, 2022); *Fowler v. Comm'r of Soc. Sec.*, 2022 WL 3648436 at * 9 (N.D. Ohio Aug. 9, 2022), *report and recommendation adopted by* 2022 WL 3647771 (N.D. Ohio Aug. 24, 2022).

### ii.    The ALJ's Analysis

The ALJ addressed the persuasiveness of the medical opinion of Bonnie Crowe, LPC, as follows:

> As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows: Bonnie Crowe, LPC, wrote a letter, dated March 23, 2020, and outlined the claimant's diagnosis, reported symptoms, as well as her treatment. (Ex. 9F pg. 2). The undersigned finds that this is somewhat persuasive. The medical records in the file support the diagnosis of major depressive disorder and PTSD, however, Ms. Crowe did not opine any specific functional limitations regarding the claimant's ability to perform work-related activities. This detracts from the overall persuasiveness of her opinion.
>
> On March 23, 2020, Bonnie Crowe, LPC, completed a medical opinion and opined that the claimant would not be incapacitated for a single continuous period of time due to her medical condition. (Ex. 11F pg. 9). Additionally, she opined that the claimant was unable to perform any of her job functions, and she would have difficulties concentrating. (Ex. 11F pg. 8). She further opined that she was unable to determine the frequency of flare-ups and duration of the claimant's related incapacity. (Ex. 11F pg. 9). The undersigned has considered this opinion and finds that it is not persuasive. First, her opinion is internally inconsistent as she opined that the claimant would be incapacitated for a single continuous period of time and she opined that the claimant was unable to perform any of her job functions. Moreover, her opinion was vague, as she opined that the claimant would have episodic flare-ups of her symptoms, however she could not provide an opinion as to the frequency, or duration, of her flare-ups. Lastly, she opined that the claimant was unable to perform any of her job functions. This is an issue that is reserved to the Commissioner, and therefore this evidence is inherently neither valuable nor persuasive. (20 CFR 404.1520b(c)(3); 416.920b(c)(3)).

(Tr. 22-23).

### iii.    Ms. Benner's Arguments

Ms. Benner argues that the ALJ's analysis of her treating source is error because he failed to assess Ms. Crowe's medical opinion in accordance with SSA regulation. Specifically, she asserts that the ALJ failed to consider the episodic nature of her symptoms, meaning the ALJ failed to consider the entire record regarding the waxing and waning of her symptoms. (*Id.* (citing *Keyse*

*v. Saul*, No. 1:19-cv-2495, 2021 WL 1214691, at *20 (N.D. Ohio Mar. 31, 2021)). She asserts that

the medical opinion reported that she was unable to perform her job functions due to symptoms of

unsteadiness, shaky hands, and difficulty concentrating. (*Id.* (citing Tr. 735)). Further, Ms. Benner

notes that Ms. Crowe opined that, due to Ms. Benner's problems, she would have periods of

decreased interests, difficulty concentrating, sleep disturbance, fatigue, re-experiencing, avoidance

of reminders of trauma, negative emotional state, diminished participation, detachment, irritability,

and hypervigilance. (*Id.* (citing Tr. 735)). She asserts that the treating source also opined that if

Ms. Benner was triggered, she may have a flashback or engage in avoidance. (*Id.* (citing Tr. 735)).

#### iv.    Analysis

Ms. Benner's assertion is not well-taken. She contends that the ALJ "based his conclusion

that the opinion of the treating source was not persuasive or valuable based on the episodic nature

of the symptoms which would preclude work." (ECF Doc. 8, PageID#942). Yet, this was not the

ALJ's conclusion. Indeed, the ALJ found that Ms. Crowe's was "somewhat persuasive" because

it was supported by a diagnosis of major depressive disorder and PTSD. (Tr. 22). However,

because Ms. Crowe did not opine on any specific functional limitations regarding Ms. Benner's

ability to perform work-related activities, the ALJ concluded that this detracted from the overall

persuasiveness of her opinion. (*Id.*). Specifically, as Ms. Benner points out, the ALJ noted that Ms.

Crowe opined that Ms. Benner was unable to perform any of her job functions and would have

difficulties concentrating. (Tr. 23 (citing Tr. 735)). The ALJ further noted that Ms. Crowe opined

that Ms. Benner was unable to determine the frequency of flare-ups and duration of the claimant's

related incapacity. (*Id.* (citing Tr. 736)).

In reaching the conclusion that Ms. Crowe's opinion was unpersuasive, the ALJ addressed

the consistency factor under the regulation by noting that Ms. Crowe's opinion was internally

inconsistent because she opined that Ms. Benner would be incapacitated for a single continuous period of time, yet also opined that Ms. Benner was unable to perform any of her job functions. (Tr. 23, 735, 736). Furthermore, the ALJ pointed out that Ms. Crowe's opinion was vague because, although she opined that Ms. Benner would have episodic flare-ups of her symptoms, Ms. Crowe did not provide an opinion as to the frequency or duration, of those flare-ups. (Tr. 23, 736). "The vagueness of a medical opinion is a proper basis on which to afford it less weight." *See, e.g., Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008). Moreover, supportability and consistency—which as demonstrated above, the ALJ did address—are considered some of the most important factors under the SSA regulations. 20 C.F.R. § 404.1520c(a). Therefore, the ALJ's evaluation was proper.

Moreover, the sole authority that Ms. Benner relies on to make her variability argument, *Keyse*, is unavailing. In *Keyse*, the court determined that the ALJ erred in his evaluation of a treating source opinion because, among other things, the ALJ failed to consider the treating source's opinion in light of two previous opinions by that same source. *Id.,* No. 1:19-cv-02495, 2021 WL 1214691, at *20. Because the ALJ considered the treating source's most recent opinion in isolation, *Keyse* found that the "ALJ did not consider the entire record regarding the waxing and waning of Plaintiff's symptoms." *Id*. at *20.

Here, there is only one treating source opinion in the record. Moreover, the ALJ's decision included consideration of Ms. Benner's subjective symptom complaints and the medical evidence, demonstrating the ALJ considered the variability in her symptoms.  Specifically, the ALJ acknowledged that Ms. Benner had major depressive disorder, post-traumatic stress disorder, and generalized anxiety disorder. (Tr. 18). He also noted that Ms. Benner reported anxiety, focus struggles, visual hallucinations, flashbacks, and crying spells. (Tr. 21). Because Ms. Benner has

37

failed to demonstrate how the ALJ erred in his evaluation of the treating source opinion, I recommend that the Court find that this sub-claim is without merit.

### b. Subjective Symptoms Discussion

### i. Legal Standard

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See Moore v. Comm'r of Soc. Sec.*, 573 F. App'x. 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at *3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).[7]

In evaluating a claimant's symptoms at the second step of the analysis, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider. These factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the

---

[7] The SSA previously characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination. See SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996). In March 2016, however, the SSA issued SSR 16-3p. Therein, the SSA explained that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-regulatory policy. See SSR 16-3p, 2016 WL 1119029 (Oct. 25, 2017). The SSA explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record. SSR 16-3p, 2016 WL 1119029. Despite these changes in terminology, courts have concluded that SSR 16-3p did not substantially change existing law on this issue. *See Banks v. Comm'r of Soc. Sec.*, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting language in SSR 16-3p that states intention to "clarify" and not to substantially "change" existing SSR 96-7p), adopted at 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at *7.

The ALJ is not required to discuss each of these factors or even all the evidence in the record, but need only acknowledge the factors and discuss the evidence that supports his decision. *See Bryson v. Comm'r of Soc. Sec.*, 2021 WL 2735993 at *14 (N.D. Ohio June 10, 2021), adopted by, 2021 WL 2720071 (N.D. Ohio July 1, 2021). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029 at *9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

An ALJ is not required to accept the claimant's complaints at face value but may discount them based on his consideration of the above factors. *See Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x. 113, 119 (6th Cir. 2016); *Bryson*, 2021 WL 2735993 at *15. In light of the ALJ's opportunity to observe the claimant's demeanor, the ALJ's evaluation of a claimant's subjective symptoms is entitled to considerable deference and should not be discarded lightly. *See Dooley*, 656 F. App'x. at 119 ("[A]n ALJ's credibility determinations about the claimant are to be given

great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'") (quoting *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)); *see also Walters v. Comm'r. of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Jidas v. Comm'r of Soc. Sec.*, 2019 WL 2252289 at *8-9 (E.D. Mich. Feb. 26, 2019), adopted by, 2019 WL 1306172 (E.D. Mich. March 22, 2019).

Indeed, a reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001); *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017) (noting that "while an ALJ's credibility determinations must be supported by substantial evidence, we accord them special deference"); *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 476 (6th Cir. 2016) (noting that, "in practice ALJ credibility findings have become essentially 'unchallengeable.'"); *Riebe v. Comm'r of Soc. Sec.,* 2019 WL 4600628 at * 7-8 (N.D. Ohio Sept. 23, 2019) (same ).

### ii.  Ms. Benner's Arguments

Ms. Benner's next claim is that the ALJ did not properly evaluate the medical evidence and make a defensible determination as to whether Benner's testimony was credible. (ECF Doc. 8, PageID#943). Benner points to the following hearing testimony and evidence as support:

- ***Hearing Testimony***
  - o  Ms. Benner testified that she was unable to work full-time due to her depression and flashbacks of things that have been happening in her life. (Tr. 41). She also had memory issues. (*Id.*).

  - o  She testified that she gets dizzy and lightheaded frequently and her balance would be off. (*Id.*).

  - o  She stated that she could walk halfway around the grocery store and then she would be "ready to get out of there." (*Id.*).

  - o  In terms of short city blocks, she testified that she could walk "probably a half" block because her balance would be off. (*Id.* at 41-42).

- o She testified that she could stand for 10 minutes (Tr. 42) and sit for 10 minutes (Tr. 43).

- o She stated she had attended physical therapy, and they limited her lifting to 5 or 8 pounds. (Tr. 42).

- o She testified that she was able to cook, but she would often forget to turn the stove off. (Tr. 44). She also stated that she did her chores, but it took two times longer than before. (*Id.*). She also testified that she could no longer mow the yard, hand wash dishes, and do deep cleaning. (Tr. 45).

- o She stated that she could no longer focus when reading. (Tr. 45).

- o She testified that she would have flashbacks and when she would get certain ones she would "completely lose it." (Tr. 46). She stated that she would begin bawling and "have to just…get away from everybody, everything." (*Id.*). She would have an anxiety attack and then she would not eat for days. (*Id.*).

- o She testified that she has memory issues where she could not remember certain things. (*Id.*).

- o She stated she was on two medications for her palpitations. (Tr. 47).

- o She stated that she still had flashbacks. (Tr. 48).

- o She also testified that she would see things that were not there. (Tr. 50).

- **Ms. Benner's Function Report**
  - o She stated that she had difficulties concentrating and thinking as she would get dizzy and lightheaded a lot. (Tr. 192). She would miss a lot of work due to depression, fatigue, fears, wanting to be alone, and not wanting to be around people. (*Id.*).

  - o She indicated that she would not get dressed "unless she absolutely had to go outside." (Tr. 193).

  - o She stated she had a hard time focusing on what she was reading. (Tr. 196).

- **Functional Report from Ms. Benner's Son**
  - o  Ms. Benner's son wrote that Ms. Benner would get dizzy and almost fall all the time. (Tr. 238).

  - o He stated that Ms. Benner would need to be reminded to bathe, care for her hair, and feed herself. (Tr. 239).

41

     ○ He wrote that at times, she needed help understanding paperwork and would need words repeated. (Tr. 243)

  Ms. Benner contends that the ALJ "failed to articulate any rationale beyond the boilerplate paragraph finding that [her] statements were inconsistent with the medical evidence." (ECF Doc. 8, PageID#944) (citing Tr. 21). Further, she asserts that the matter should be remanded to reassess Ms. Benner's subjective symptoms because the ALJ failed to explain how her daily activities undermined the subjective report of her symptoms. (*Id.* at 945).

### iii. Analysis

  The ALJ failed to properly articulate his reasons for finding Ms. Benner's subjective complaints of dizziness and her mental/physical limitations were not credible. As pointed out by the Commissioner, the ALJ arguably did consider the frequency and intensity of Ms. Benner's symptoms by incorporating Ms. Benner's testimony—albeit very briefly—that she had memory issues, anxiety attacks, problems reading due to focus issues, visual hallucinations, and fogginess in her head. (Tr. 21). Yet, the ALJ's specific discussion of credibility appears to omit any mention of Ms. Benner's testimony regarding her dizziness. (*See* Tr. 21-22). Moreover, while the ALJ did dedicate some discussion to the frequency and intensity of Ms. Benner's reported symptoms, this is just one factor to be considered in the credibility formulation. For example, the ALJ's decision contains no detailed analysis of the daily activities Ms. Benner testified to at her hearing. (*Id.*). As demonstrated by Ms. Benner, she provided testimony regarding dizziness that the ALJ failed to address at all in his 16-3p analysis. (Tr. 41-42).

  An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th

Cir. 2006). But the regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p, 2017 WL 5180304, at *10.

Because the ALJ did not mention Ms. Benner's dysautonomia, dizziness, or other related impairments, I cannot find "his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky*, 167 F. App'x at 508. As stated previously, the ALJ did not discuss Ms. Benner's dysautonomia, PSVT, dizziness, and their resulting symptoms. This lack of discussion makes it difficult to determine whether the ALJ considered Ms. Benner's subjectively-reported dizziness symptoms and discounted them (or found they imposed no further work-related limitation), or simply did not recognize them at all. SSR 16-3p, 2017 WL 5180304, at *10. Accordingly, I recommend that the Court remand this case.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court should VACATE the final decision of the Commissioner and REMAND the case for further proceedings consistent with this Report and Recommendation.

Dated: February 24, 2023

_s/ Jennifer Dowdell Armstrong_
Jennifer Dowdell Armstrong
United States Magistrate Judge

## VII.    NOTICE TO THE PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all

parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).